ZIEGLER v. LAKE ST. EL. R. CO. et al.

(Circuit Court, N. D. Illinois. June 18, 1895.)

CORPORATIONS—AGREEMENT AMONG STOCKHOLDERS—FRAUD.

One Z. and others, holders of a majority of the stock of the L. Ry. Co., entered into an agreement to pool their holdings and act together in the election of directors, and control of the road. Directors were elected in pursuance of the agreement, one of them being Z., who, on his resignation, was succeeded by a nominee of his own. The L. Ry. Co. obtained authority to extend its road, and made contracts for building the extension. Subsequently, instead of completing the extension itself and obtaining the money to do so, and to maintain its credit, from the members of the pool, as it might have done under their agreement, the company, under resolutions of the directors, entered into agreements with other elevated railway companies for the construction of the extension and formation of a connection with the other roads, giving them a right to use the extension to connect with the L. Co. Z. filed a bill against the company, alleging that the independent construction and ownership of the extension was of so great value to the L. Ry. Co. that the contracts for combination with other roads in its use amounted to fraud, and asked for an injunction and receiver. He also alleged that certain of the directors were also interested in the other roads with which the combination was made, and that other contracts looking to the same general purpose had been made, which Z. believed to be fraudulent. It appeared from the bill that the course pursued by the company was adopted by the directors, in pursuance of the pooling contract, in accordance with the views of Z.'s associates, who held a larger proportion of stock than he, and that such contract was still in force, and still insisted on by Z. Held, that the bill failed to show fraud on the part of the directors, and that Z., having joined in the pool, was not in a position to prevent, by a stockholders' bill, acts which appeared to be within the scope of what might be done by such pool, under the contract.

This was a suit by William Ziegler against the Lake Street Elevated Railroad Company and others to enjoin the performance of certain contracts. The defendants demurred to the bill.

T. S. McClelland and S. P. Shope, for complainant.

Knight & Brown, Dupee, Judah & Willard, S. P. McConnell, and John A. Rose, for defendants.

SHOWALTER, Circuit Judge. On April 8, 1895, complainant, a citizen of New York, filed his bill against the Lake Street Elevated Railroad Company, an Illinois corporation, its nine directors, citizens of Illinois, and one John J. Mitchell, also a citizen of Illinois. On April 20th complainant filed an amendment to his bill, and on May 3d a further addition, in the form of a supplemental bill, wherein he makes the Northwestern Railroad Company, the West Chicago Street Railroad Company, the Columbia Construction Company, the Union Elevated Railroad Company, and the City of Chicago parties defendant. Complainant asks for an injunction and receiver, with other relief, and the defendants, or some of them, now question the sufficiency of the bill by a demurrer. The capital stock of the Lake Street Elevated Railroad Company is $10,000,000, divided into 100,000 shares of $100 each. Complainant says "he is the owner of 10,000 shares of said stock," and the theory of the bill,

which is a stockholders' bill, is that the defendant directors have wronged the corporation.

On June 29, 1894, the Lake Street Elevated Railroad Company owned and operated an elevated road on Lake street, Chicago, from Market street to Fifty-Second, a distance of seven miles. Besides this piece of road, the company had property then estimated to be worth $881,000. The company's property was then subject to a mortgage to secure bonds aggregating $6,500,000, and its total liabilities, figured as of the date last mentioned, aggregated some $7,500,000. On the 5th of July, 1894, a writing was made between complainant and the defendant Mitchell. The latter had acquired, in part by purchase from complainant himself, some 52,000 shares of the capital stock of the Lake Street Elevated Railroad Company. Mitchell, it seems, represented in his holdings of stock other persons not disclosed in the body of the writing. The purpose of the agreement was that the members of the combine should control and manage the corporation. It was agreed that complainant, Ziegler, should go upon the market and buy other shares, sufficient to make the aggregate of all the stock in the pool 60,000 shares. In case the price paid by him should exceed $18 per share, the other members of the combine were to advance to him five-sixths of the excess; and in case the stock should cost less than $18 per share, then Ziegler was to account in the same proportion to the pool. It was stipulated that the said stock "should be voted as a unit in all matters pertaining to said company; and for the purpose of making the stock of said company more valuable, the said parties hereto each agree to contribute or pay such sum or sums of money as may be necessary towards the payment of present liabilities against said company, which said parties hereto may deem advisable or necessary to pay in order to add such value to said stock holdings, in the following proportions, namely, said Mitchell's principals five-sixths ($5/6$), and said Ziegler one-sixth ($1/6$); and all moneys so advanced by said parties shall be so advanced upon like and equal terms, conditions, and securities therefor. Said Ziegler shall be entitled at his election to take one-sixth of any bonds sold by said railroad company coming to parties hereto and entitled to one-sixth ($1/6$) of all assets and benefits covered or acquired in said purchase, and in case any sale is made of the stock represented by said Mitchell's principals, or any part thereof, Ziegler shall be permitted at his election to join in the sale and have a pro rata share of his stock sold at the same price and on the same terms as the said stock of said Mitchell's principals is sold. In case any construction company is formed for the purpose of building any rail road or furnishing equipment for said Lake Street Elevated Railroad Company, or any contract let for such purpose, in which said Mitchell's principals are interested, then said Ziegler shall be permitted at his election to stand in the same relations to such construction company or said contract as said Mitchell's principals, and be entitled to share in the benefits and privileges of the same to the extent of one-sixth ($1/6$) thereof; and in case any purchase is made, or other line of railroad acquired, or in case of any sale or consolidation of said

Lake Street Elevated Railroad, then said Ziegler shall have the option to join in said purchase or consolidation upon the same terms, conditions, and requirements as said Mitchell's principals. The purpose and intent of this agreement is that in all matters pertaining to said railroad company the parties shall stand represented in the same proportion as their respective stockholdings, represented and held by each of the parties hereto, stand in relation to the whole capital stock of said railroad company, owned by all of said parties, namely, five-sixths ($^5/_6$) thereof by said Mitchell's principals, and one-sixth ($^1/_6$) thereof by said Ziegler, and that at all times said Ziegler shall be permitted to designate at least one director in said company, and that at all elections for directors of said company the said stock shall be voted in such manner that at all times said Ziegler shall designate and choose at least one member of the board of directors of said company. This agreement shall be valid and binding for a period of three years from the date hereof."

By an arrangement made prior to this agreement, and as a condition of the purchase of said 52,000 shares of stock by Mitchell, the directors of said company, except Ziegler himself, resigned, and the directors who are named as defendants in this bill, except John Morris, were thereupon elected. Ziegler continued to be a director down to the month of January, 1895, at which time Morris was elected as his successor. On October 1, 1894, the Lake Street Elevated Railroad Company was licensed by the city of Chicago and the property owners interested to extend its road along Lake street east to Wabash avenue. Construction contracts were, or a construction contract was, thereupon made, the materials for the superstructure were manufactured, and a portion of said extension from the Market street end had been completed at the time of filing the amendment to the bill. On December 18, 1894, it is said in the bill the work of constructing said extension "had progressed favorably."

On the date last named, the said defendant directors voted to make a treaty between the Union Elevated Railroad Company, of the one part, and the Lake Street Elevated Railroad Company, the Northwestern Elevated Railroad Company, the Metropolitan West Side Elevated Railroad Company, and the Chicago South Side Rapid Transit Railroad Company, of the other part. It was proposed that the Union Elevated Railroad Company should construct a line of elevated road from Lake street south on Franklin to Van Buren street; thence east on Van Buren to Wabash avenue; thence north on Wabash avenue to Lake street; thence west on Lake street to the place of beginning. The Metropolitan road might then connect with such loop at the southwest corner, the South Side Rapid Transit Company at the southeast corner, and the Northwestern Elevated Railroad Company at some point on Lake street. The said Union Elevated Railroad Company was to arrange with the Lake Street Elevated Railroad Company to use its extension on Lake street from Market to Wabash avenue as the north side of said loop. The Union Elevated Railroad Company was spoken of as lessor and the four other companies as lessees. The lessor was to obtain the consent of the prop-

erty owners and the city, and if it failed in so doing by a certain time the agreement might be terminated. The said lessor, instead of procuring "an ordinance authorizing the construction of the north side of said loop line, and constructing the same according to the provisions of said ordinance, might procure from the said Lake Street Elevated Railroad Company all its rights in and to that portion of its railroad hereinafter described, including the right to construct or complete the construction thereof, so that said lessor may lawfully include in the leases hereinafter provided for the same right of use by the lessees in and to said portion of said Lake Street Railroad as a part of said loop line as is provided to be given in respect to the east, south, and west portions of said loop line, which is to be constructed under the ordinance aforesaid. Said portion of said railroad of said Lake Street Elevated Railroad Company is described as follows: The double-track elevated railroad of said Lake Street Elevated Railroad Company, to be constructed on and along Lake street from the point of commencement of the west side of said loop line to the point of termination on the east side of said loop line, as hereinabove described, and the elevated railroad of said lessor (which by this agreement is made the subject of lease and demise) shall, in the event of said substitution, be considered to be the loop line or circuit formed by the railroad to be authorized by the ordinance aforesaid, upon the east, south, and west, and that part above described of the elevated railroad of said Lake Street Elevated Railroad Company upon the north. In the event of such a substitution, if said double-track elevated railroad on that portion of said Lake street above described has not been fully completed, the said lessor shall with all diligence fully complete the same and equip it as herein provided for the remaining portion of said loop line." A further provision was "that no trains or cars shall be run upon said loop line or any part thereof, except those of the lessees, and that while the use of said loop line by all of the lessees shall be equal in character, the number of trains run by each shall be in proportion to the rental paid by each." And, further, "that the terms and conditions of the leases to each of said lessees shall be identical, and that the said leases shall provide that the amount of rental to be paid by each of said lessees shall bear that proportion to the whole amount of rental to be paid by all the lessees that the number of passengers carried by each lessee bears to the whole number of passengers carried by all of said lessees," etc. Another stipulation in said treaty was as follows: "It is further agreed and understood that if the said lessor shall be unable to procure from the said Lake Street Elevated Railroad Company all its rights in and to said railroad on Lake street, it shall at least procure the right to complete said railroad and operate the same, and to grant to the said lessees the exclusive right of user thereof under the leases hereinafter mentioned."

On the 28th of December, 1894, the Lake Street Elevated Railroad Company entered into a contract with the Union Elevated Railroad Company concerning the said Lake street extension. It was recited in the preamble to this agreement that the Lake Street Company "is without the necessary means to complete the construction of its said

line of railway in Lake street between Market street and the east line of Wabash avenue, as authorized by the ordinance of October 1, 1894, and is unable to make the payments or perform its agreements, stipulated to be paid and performed, in and by a certain agreement, in writing, of date October 15, 1894, made by said Lake Street Railroad with the Phoenix Bridge Company for the construction of said railroad in Lake street between Market street and the east line of Wabash avenue." It was thereupon agreed that the Union Elevated Railroad Company should make the payments stipulated to be paid to said Phoenix Bridge Company so as to complete the said extension. The Union Railroad Company further agreed to reimburse the said Lake Street Company all such sums as had been expended by the latter company in securing frontages for its said line of railroad in Lake street; also such further "sum or sums of money as have been expended by said Lake Street Railroad for rights of way in said Lake street, or for other privileges, matters, or things properly and justly chargeable to that part of its right of way in Lake street; and also the further sum of $55,000 expended by said Lake Street Railroad in putting in the structural foundations for said Lake street line under its agreement with the said Phoenix Bridge Company." It appears that the amount to be paid for the right of way here mentioned was $140,000, which, with the $55,000, amounted to $195,000. This sum, aside from the additional cost of building and completing the extension from Market to Wabash, was to be paid by the Union Railroad Company to the said Lake Street Elevated Railroad Company. It was further provided that the permission and authority "to use the said tracks of the said Lake Street Railroad, in the manner and for the purpose of this agreement expressed, shall not pass any interest, nor alter or transfer property in anything belonging to said Lake Street Railroad; that the permission and authority and privileges hereby granted by said Lake Street Railroad to said Union Railroad and other elevated railroads shall be held and considered as a mere permission or license to use the tracks of said Lake Street Railroad in the manner aforesaid and for the purpose aforesaid, without said Union Railroad or other elevated railroads acquiring or possessing any estate therein." It was further provided "that no consideration or compensation should be paid by or charged to said Lake Street Railroad for the use of, or right to use, any part of the railroad belonging to said Lake Street Railroad Company in said Lake street. But otherwise, said agreement shall be made upon the same terms and conditions in every respect as shall be stipulated and agreed to between such other elevated railroads and said Union Railroad." It was further provided as a condition on which the Lake Street company licenses the other companies to run over its track, that such other companies shall agree to "operate their cars upon and along the proposed elevated loop to be constructed by said Union Railroad."

On the 27th of December, 1894, the directors of the Lake Street Elevated Railroad Company passed a resolution reciting in the preamble that the company would be unable to pay the interest which would be due on its bonds on January 1, 1895, and unable to pay a

debt of $61,725.80, also maturing in January, and that a corporation called "Columbia Construction Company," which the bill avers was organized to construct the Northwestern Elevated road, had offered to loan $250,000, on condition that the Lake Street Company, in the event that the Union Company failed to obtain permission from the city and property owners to build its loop, would agree with the Northwestern Company granting to the latter the right to use its Lake street extension in consideration that said Northwestern Company would pay half the cost of constructing and maintaining the said extension; and thereupon declaring that the proposition of the said Columbia Construction Company be accepted, etc. Afterwards, on the 31st of December, 1894, the said defendant directors rescinded the said resolution of December 27, 1894, and agreed to turn over to the Columbia Construction Company the interest coupons which fell due in January, to be held by said company as collateral for the sum of $178,750, advanced by said company to pay said coupons, and they further agreed to borrow from said Columbia Construction Company, or from any person willing to make the loan, enough money to pay the above-mentioned debt of $61,725.80, giving such collateral "as the company might be able to furnish."

After the resolution of December 27th, and prior to that of December 31st, complainant, "through his representative in Chicago, protested against the acts of said board of directors, and called upon Mitchell and his associates, owners of said majority of stock in said Lake Street Elevated Company, and their representatives, the said board of directors of said Lake Street Elevated Railroad Company, to comply with said contract of July 5, 1894, and contribute, with your orator, a sum necessary to meet and pay said January, 1895, interest coupons, and all obligations then matured, in the proportion of one-sixth ($1/6$) by your orator and five-sixths ($5/6$) by said majority stockholders; and, if the necessity existed, your orator would temporarily advance a sum sufficient to pay such immediately maturing obligations himself, which was not accepted." How much, and upon what security, and for what time, and upon what other terms, Ziegler proposed to lend to the company, is not stated. I may add that the company had no interest in and could not enforce the agreement, or rather proposal, in the contract of July 5, 1894, by the members of the combine with each other to supply the company with money.

It is said in the bill that when complainant Ziegler sold his shares to Mitchell, and agreed to buy other shares and to enter the combine, as made in the paper of July 5, 1894, "it was represented by said Mitchell" that "the reorganization of said the Lake Street Elevated Railroad Company contemplated by the change of ownership would result in a large number of wealthy and influential persons becoming interested in the deal, and a new impetus would be given to said railroad company, its lines of traffic extended, its down town facilities completed and improved, and the value of its stock enhanced, and the parties agreed that they would build the Lake Street road down Lake street as far as Wabash avenue, or give an equally good terminal, and that they would also build what is known as the 'Humboldt Park

Line,' as far north as North avenue, a distance of about two and one-fifth miles, and that no wrecking expedition was to be carried on," etc. It is stated further that in December, 1894, said Lake Street Company "had the means and was able to procure the means, under your orator's said contract of the 5th of July, 1894, aforesaid, to construct and build said eastern extension of said Lake Street Elevated Road from Market street to Wabash avenue"; also, that under the mortgage, the provisions of which are not stated in the bill, there was "power to negotiate and issue additional bonds"; that is to say, bonds in addition to the $6,500,000 bonded debt already outstanding. It is further declared in the bill that the Lake street extension, "when completed," and "the sole rights" of the Lake Street Company "in said Lake street, was a most valuable acquisition, and one which could be utilized in making combinations with other elevated railroads, to run its trains eventually in any part of the business part of said city of Chicago between said Lake street and a point as far south as it would be feasible for said railroad company to run its trains"; and one matter of complaint is that the two agreements of December 18th and 28th were so far against the interests of the Lake Street Company as to show fraud and treachery on the part of said defendant directors.

By the agreement of December 28th the Lake street extension is to be built without cost to the Lake Street Company, and said company retains complete ownership and possession. If said company shall choose to run its trains around the other three sides of the loop, it must pay for the privilege at a rental to be fixed. Whether it has engaged to use the loop is at least doubtful. But each of the other companies must run its trains around the loop so that every company connecting with the loop becomes a feeder to the Lake street road. These roads are not competitors. The charter purpose—the legitimate and appropriate source of revenue,—is the passenger traffic. It is possible that the "sole rights" of the Lake Street Company in said Lake street might have been used as means for greater exactions from roads seeking terminals in the center of the city. But such "sole rights" were not given to the Lake Street Company as a mere instrumentality of barter with or of advantage over other like corporations. I am not able to say, especially in view of the financial condition of the Lake Street Company, as shown in the bill by matters already spoken of, that the deals of December 18th and 28th indicate fraud or unfairness on the part of the defendant directors toward said company. It is further stated that three of the nine directors of the Lake Street Company were also directors in the Northwestern Company, and that two of said three were directors in the Union Company. Said contracts are not, merely for this reason, fraudulent, or voidable at the instance of the Lake Street Company. Rolling Stock Co. v. Railroad Co., 34 Ohio St. 450. Nor does it make out a case of fraud that the holders of a majority of the stock in the latter company may have held stock in one or more of the other contracting companies. Nor do general unsupported averments that the six directors who are not shown to have held official relation to or interest in any of

the other companies were "controlled by," or were "mere instruments in the hands of," the holders of the majority stock in the Lake Street Company, overcome the legal presumption of fairness and good faith.

On the 21st of February, 1895, certain persons interested in the Lake Street Company organized a plan whereby the bonded debt of said company should be reduced or scaled down 25 per cent., and its mortgage debt 40 per cent. This was to be the voluntary act of the bondholders themselves, and the inducement was the sounder financial footing thus secured for the company, and a guaranty by the Northwestern Company of the mortgage debt when so reduced. But in carrying out this policy the Lake Street Company engages—and this is the point of objection by complainant—that it will not issue any more bonds under the old mortgage except for the purposes of construction. This may have been unwise, but I do not detect fraud on the part of the defendant directors as against the Lake Street Company. It is said in the bill that the construction of the Humboldt Park extension has been abandoned by the defendant directors "in violation of the conditions of the contract entered into by said Mitchell for said majority stockholders." But the company has no interest in said contract; and said Humboldt Park extension may be built later when the company is financially able to build it. Complainant says further that he is "advised and believes that there is a secret understanding and agreement by and between the officers and majority of the board of directors" of the Lake Street Company and the Northwestern Company that a perpetual lease shall be made transferring all the property of the former company to the latter. This unsupported averment, I take it, amounts to nothing. In the supplemental bill complainant says "that he is advised and believes that said Northwestern Company has obtained, or is about to obtain, the consent of the city and of the property owners interested, to build its road south across Lake street, and he avers that it is the intention of Lauderback and those acting with him in the management of said Lake street road to suspend the construction of said Lake street road" till the said cross track of the Northwestern shall have been so built at Fifth avenue across Lake street. He further avers "that said attempt to procure the right of way over and along Fifth avenue is in the interest of and part of the scheme of said Union Elevated Railroad Company to complete its loop line, as contemplated in said contracts of December 18 and 28, 1894, whereby said Union Company is a party to said fraudulent acts recited herein." Since the "contracts" last referred to do not involve fraud against the Lake Street Company, and since in any case the two roads might cross each other and on the same level at Lake and Fifth avenue, I do not see that anything is added to the case by the averments quoted from the supplemental bill—even if it were law that an original bill which shows no cause of action can be made good by a supplemental bill.

On the 30th of January, 1895, the Lake Street Company agreed with the West Chicago Street Railroad Company that the latter, for the operation of its Lake street surface road by electricity, might string wires to, but wholly underneath, the elevated structure of the

former, from Wabash avenue to Forty-Eighth street. The consideration was that no poles, wires, or other things should be placed anywhere on the street alongside or above said elevated railroad structure. It is averred that, as inducement to complainant to enter the combine of July 5, 1894, Mitchell, pretending to control the West Chicago Street Railroad Company in the interest of the Lake Street Company, promised complainant that the trolly system should not be used on said surface road. It is also averred that three of the nine defendant directors were directors in the West Chicago Street Railroad Company. But I am not able to say, even in view of these averments, that the contract of January 30, 1895, was fraudulent as against, or voidable by, the Lake Street Company.

When the contract of July 5, 1894, was made, Ziegler was himself a director in the Lake Street Company. He continued to be a director till the stockholders' meeting in January, 1895, at which meeting Morris, who had actively represented Ziegler in the affairs of the company since July, 1894, was elected. Morris was so elected at Ziegler's instance, and as his representative, and pursuant to the combine contract. Said contract, as shown by the bill, still continues in force, and is still insisted on by Ziegler, and the theory of the bill is that the wrongs complained of have been done by the combine of which Ziegler himself has always been, and continues to be, a member, pursuant to the terms of the writing of July 5, 1894. If a stockholders' meeting should be now had with reference to said alleged wrongs, all the stock in which Ziegler is interested would be voted in affirmance of said alleged wrongful acts, since said stock is part of the holding of the combine, and said holding must, according to the terms of the contract, be voted as a unit. Not only so, but the acts complained of, upon Ziegler's interpretation of the same, seem to fall within the general description of what the combine might do as against the Lake Street Company by said combine agreement. The portions of the agreement here referred to have been quoted, and need not be again repeated. Even if said agreement be void, the fact of assent to the same on Ziegler's part remains, and the point is that he is not in position to maintain a stockholders' bill. It is, however, due to Mr. Ziegler himself, as well as to these defendant directors and to Mitchell, to say that, looking at the ultimate matters shown in this bill, and not to the conclusions drawn therefrom by the pleader, the controversy concerns the policy of the Lake Street Company rather than the integrity of its management; and, notwithstanding the wording of the writing of July 5, 1894, it is not at all probable that any wrong against the Lake Street Company was ever really intended by the parties to that writing. The demurrer is sustained.